[Civ. No. 22400. Third Dist. Sept. 15, 1983.]

In re MICHAEL G., a Minor.
DEPARTMENT OF SOCIAL SERVICES OF NEVADA COUNTY,
Petitioner and Appellant, v.
TOM G. et al., Objectors and Respondents.

**COUNSEL**

John K. Van de Kamp, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Elisabeth C. Brandt, Deputy Attorney General, for Petitioner and Appellant.

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Judith W. Allen, Deputy State Public Defender, for Objectors and Respondents.

**OPINION**

**CARR, J.**—The People appeal from a judgment of the Nevada County Superior Court denying a petition to free Michael G. from the custody and control of his parents. (Civ. Code, § 232.) We affirm.

Michael was originally removed from his parents' care in 1978 pursuant to provisions of Welfare and Institutions Code section 300, subdivisions (a)

and (d); he has since been a dependent of the court. In February 1981, the People initiated the instant proceeding pursuant to Civil Code section 232, subdivisions (a)(3), (a)(6), and (a)(7)[1] to terminate parental rights. Following extensive testimony, the superior court entered a judgment denying the petition.

The underlying facts and essentially all of the findings of the superior court, except the determination that it would not be in the best interests of the minor to sever the parental relationship, are undisputed. Michael, born in September 1974, is a developmentally disabled child who suffers from significant emotional problems. He functions at levels significantly lower than his chronological age; at the time of the hearing, he (then age seven) was not completely toilet-trained and possessed limited language skills.

---

[1]At the time of the hearing, Civil Code section 232 provided in relevant part: "(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions: . . .

"(3) Whose parent or parents suffer a disability because of the habitual use of alcohol, or any of the controlled substances specified in Schedules I to V, inclusive, of Division 10 (commencing with Section 11000) of the Health and Safety Code, except when such controlled substances are used as part of a medically prescribed plan, or are morally depraved, if such person has been a dependent child of the juvenile court, and the parent or parents have been deprived of his custody because of such disability, or moral depravity, for the period of one year continuously immediately prior to the filing of the petition praying that he be declared free from the custody and control of such parent or parents. As used in this subdivision, 'disability' means any physical or mental incapacity which renders the parent or parents unable to adequately care for and control the child. . . .

"(6) Whose parent or parents are, and will remain incapable of supporting or controlling the child in a proper manner because of mental deficiency or mental illness, if there is testimony to this effect from two physicians and surgeons each of whom must have been certified either by the American Board of Psychiatry and Neurology or under Section 6750 of the Welfare and Institutions Code or licensed psychologists who have a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders. . . .

"The parent or parents shall be cited to be present at the hearing, and if he or they have no attorney, the court shall appoint an attorney or attorneys to represent the parent or parents and fix the compensation to be paid by the county for such services, if he determines the parent or parents are not financially able to employ counsel.

"(7) Who has been cared for in one or more foster homes, residential facilities licensed pursuant to Chapter 3 (commencing with Section 1500) of Division 2 of the Health and Safety Code, or health facilities licensed pursuant to Chapter 2 (commencing with Section 1250) of Division 2 of the Health and Safety Code, under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for two or more consecutive years, providing that the court finds by clear and convincing evidence that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do the following:

"(i) Provide a home for the child;

"(ii) Provide care and control for the child; and

"(iii) Maintain an adequate parental relationship with the child.

"Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period."

Michael's parents are both developmentally disabled and are able to be employed only in a sheltered workshop environment. Because of their own disabilities, the parents have found it difficult to cope with basic living skills such as budgeting and housekeeping. Caring for a developmentally disabled child has been beyond the capabilities of Michael's parents, who are unable to understand the nature and extent of Michael's disabilities or to cope with his special needs. The parents have received extensive social services aimed at helping them parent Michael since his birth, but such services have not proven effective.

The evidence demonstrated, and the trial court so found, that Michael's parents, due to their developmental disabilities, are incapable of controlling Michael in a proper manner. In addition, the court found that because of his own disabilities, Michael "needs to be parented by persons exceptionally well able to cope with his needs if he is to develop at or near his maximum potential."[2] The trial court found Michael came within the provisions of section 232, subdivisions (a)(6) and (a)(7),[3] and concluded it would be detrimental to Michael were he to be returned to the physical custody of his parents, either now or at any time in the future. The court further concluded, however, Michael's chances of adoption were "tenuous" at best, and that it would not be in the minor's best interest to sever the parental relationship.

DISCUSSION

This is no dispute with the trial court's determination that Michael's parents, due to their own developmental disabilities, are not able either to appreciate Michael's special needs or to provide a home in which he can fully develop. ▮ The only question is whether a child who comes within the provisions of section 232, subdivisions (a)(6) and (a)(7), must be set free for adoption, notwithstanding the trial court's determination that adoption is a "tenuous" proposition.

The People argue the trial court must sever the parental relationship in such situation, and in support cite *In re Laura F.* (1983) 33 Cal.3d 826 [191 Cal.Rptr. 464, 662 P.2d 922], in which the court stated: "[T]he purpose of [section 232] permitting termination of parental rights is to 'serve the welfare and best interests of a child by providing the stability and security of an adoptive home . . . .' [Citations.] To facilitate the stated goal, 'it seems indisputable that . . . the state as a *parens patriae* not only has a compelling

---

[2]In essence, the evidence was that Michael is a demanding child in need of consistent parenting by someone both sensitive to his needs and able to understand what his needs are. Michael's parents simply cannot provide him the care he requires.

[3]See footnote 1, *ante.*

interest but also a duty to sever the parental bonds once a situation contemplated by the statute arises.' [Citations.] [¶] There is, of course, no specific proof that Laura and Tammy will be adopted . . . . Neither, however, is there authority for the proposition that termination is improper unless there is an adopting parent waiting in the wings. The statute itself imposes no duty on the superior court to make an express finding as to the prospects for adoption of a particular child. Suffice it to say that the trial court here referred [the] children to the California Adoptive Service for placement, impliedly finding that they were . . . appropriate candidates for its services. [¶] We take no issue with the proposition that the purpose of section 232 is to facilitate the adoption of minor children. We also recognize that some children are more 'adoptable' than others and that a child's chances of obtaining the security of an adoptive home are lessened by emotional or physical handicaps. But for a child who faces, in all probability, perpetual foster care with no realistic chance for a stable home with natural parents, it can only be a plus to become legally eligible for adoption. We are satisfied that the possibility of adoption for [the] children is at least as good or better than the possibility—described by the court as 'extremely remote'—that [the mother] will ever be capable of exercising parental responsibilities. Thus the termination of parental rights under these circumstances is 'the least detrimental alternative' for the . . . children whose only other realistic alternative is the limbo of perpetual foster care. [¶] In sum: the evidence amply supports the findings of the trial court and its disposition is entirely in accord with the legislative purpose of section 232." (33 Cal.3d at pp. 837-838; fns. omitted.)

The People assert the foregoing represents a new standard for severance of the parental-child relationship; i.e., that such relationship must be severed whenever a trial court determines the conditions set forth in section 232, subdivisions (a)(6) and (a)(7) exist. We disagree.

We perceive the primary holding of *Laura F.* to be: "Viewing this record in the light most favorable to the judgment below, there clearly is substantial evidence that termination is in the best interest of the children." (33 Cal.3d at p. 836.)[4] We also view the record in the light most favorable to the trial court's determination that severance was not in Michael's best interests.

The trial court was faced with the dilemma of whether to sever the parent-child relationship in light of the court's determination that Michael's prospects of being adopted were slight. While three witnesses did testify as to

---

[4]In *In re Laura F.*, the trial court impliedly found the prospects of adoption were good, in light of its decision to refer the children to the California Adoptive Service for placement. (See 33 Cal.3d at p. 838.) Here, the trial court made an express finding that the chances of adoption were slight.

their belief that an adoptive home for Michael could be found, all conceded adoption would be difficult in light of Michael's special needs and the special adoptive parent(s) needed to care for him.

Section 232 does not require an adoptive parent be waiting in the wings, and likewise does not impose upon the superior court a duty to make an express finding as to the prospects for adoption of a particular child. (*In re Laura, F., supra,* 33 Cal.3d at p. 838.) However, section 232 does not preclude a trial court from making a finding as to the prospects of adoption. Here such finding was made. Based on the trial court's appraisal of the evidence and the credibility of the witnesses, it concluded the possibility of Michael's being adopted by suitable parents was tenuous, not only because of Michael's special needs, but also because he was rapidly approaching an age which would render him difficult to place for adoption.

However, the evidence also disclosed that Michael's parents, despite their parenting limitations, love their child, and have consistently expressed an interest in his welfare. There was a bonding of parent and child during Michael's early years when he was in the custody of his parents. In his present foster home situation, Michael is permitted periodic visits with his parents, and nothing in the record indicates such visits are detrimental to Michael. Most important, there was expert testimony that placement of Michael *in an appropriate foster home* could provide him both with the consistency of parenting that he needs and the opportunity to maintain a relationship with his natural parents.[5]

In section 232.5, the Legislature has directed that the statute providing for termination of parental rights "shall be liberally construed to serve and protect the interests and welfare of the child." "[L]iberally construed" surely does not mean that in each case the statute must be liberally construed to terminate the parent-child relationship but rather that the determinative factor in each case must be the best interests of the child. (Civ. Code, §§ 232, subd. (b), 232.5.) The trial court concluded that notwithstanding the prospect that Michael's parents would not be able to provide him with proper care, severance of the parental-child relationship would not be in Michael's best interests. Such determination is fully supported by the record and we will not substitute our judgment for that of the trial court.

The judgment is affirmed.[6]

---

[5]According to the expert testimony, Michael has made great strides in his present foster home environment. Indeed, one psychologist described Michael's improvement as nothing short of a "small miracle." Michael's present foster parents indicated, however, they do not wish for either permanent foster placement or to adopt Michael.

[6]Respondent attached to his brief a "Motion to take Judicial Notice" of the permanency planning report and recommendation filed in January 1983 with the Nevada County Superior Court. That motion is denied as not being within the parameters of *In re Elise K.* (1983) 33 Cal.3d 138 [187 Cal.Rptr. 483, 654 P.2d 253].

Blease, Acting P. J., concurred.

**SIMS, J.**—I agree that the trial court was well within its discretion in reaching the conclusion it did on the evidence presented to it. I write simply to address the People's principal contention on appeal, which is that, "So long as [Michael] is not free, no fully effective efforts can be made to find him a home, both because his need for a home cannot be publicly disseminated unless he is free and because prospective adoptive parents rarely commit to a child who may or may not become available for adoption. This leaves Michael and any child like him in a 'Catch-22' situation where he cannot be freed without being in an adoptive home and he cannot find an adoptive home without being freed."

The primary problem with the People's position is that they presented no evidence to the trial court in support of their argument that freedom from a parental relationship increases the prospects of adoptability. Consequently, neither the trial court nor this court has had an opportunity to measure the People's argument against hard evidence. There is simply no evidentiary basis upon which the decision of the trial court may be questioned.

If, as the People assert, it is true that children like Michael are not usually adopted without a termination of parental rights, then the answer to Michael's dilemma is probably best found in the Legislature. As the law now stands, Michael faces a risk not mentioned by the People: that his parental rights will be terminated and that, notwithstanding the best efforts of the state, he will not be adopted. The People's position would put Michael in a position where he could be cut loose from his natural family with no guarantee of finding a safe, adoptive parental harbor. Perhaps what is needed, if the People's assertions are correct, is legislation authorizing in appropriate cases the conditional termination of parental rights, i.e., a legal determination that adoption is in the best interest of the child, and that the child is suitable for adoption, but without a legal termination of parental rights until adoption is accomplished. In broad terms, such a legislative scheme might permit the state to advertise the availability for adoption of children like Michael but would not leave the children in an uncertain abyss between sets of parents.