Filed 5/19/14  In re William S. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Butte)

----

| | |
|---|---|
| In re William S., a Person Coming Under the Juvenile Court Law. | C073325 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. No. J35973) |
| Plaintiff and Respondent, | |
| v. | |
| C.S., | |
| Defendant and Appellant. | |

C.S., mother of the minor, appeals from the juvenile court's orders denying her petition for modification and terminating her parental rights.  (Welf. & Inst. Code, §§ 366.26, 388, 395.)[1]  On appeal, she contends (1) the juvenile court erroneously denied

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

her petition for modification seeking reunification services; (2) the juvenile court's finding that the minor is adoptable is not supported by substantial evidence; (3) the beneficial parental relationship exception to adoption should have been applied in this case; and (4) the Indian Child Welfare Act (ICWA) notice requirements were not fully met. We disagree with mother's assignments of error and shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother initially left the then three-year-old minor, William S., with her mother (the minor's maternal grandmother) in December 2010, when mother was convicted of vehicular manslaughter while intoxicated. Mother was subsequently sentenced to state prison for four and a half years. The maternal grandmother, at some later point, gave the minor to mother's boyfriend (D.B.) to care for, who, in turn, gave the minor to his mother (L.B.).

The minor was detained in July 2011, when an anonymous individual reported that D.B. had come into his/her home with the minor and the minor's nose was bleeding profusely. When asked what had happened, D.B. stated he had punched the minor in the nose. D.B. was also very rough with the minor during that visit. The minor was subsequently interviewed and reported that it was his "meemaw," L.B., who had hit him in the nose. L.B. was interviewed and stated she had squeezed the minor's face in her hands and forcefully turned his head, which had caused his nose to bleed. The juvenile court took jurisdiction over the minor on September 1, 2011, finding mother had failed to make appropriate legal arrangements for care of the minor during her incarceration.

The social worker's October 2011 disposition report stated that the minor was healthy and doing well educationally. Visits with his mother at the jail were described as "enjoyable for both," although he often wondered why his "mommy can't come out of 'grown-up' timeout." He was described as a gentle boy who demonstrated aggression only after being pushed into it by another child. He was, however, "acting out" in both

2

foster care and school. He was protective of his belongings, clingy toward his foster mother, and would sometimes cry to get his way or put up a fuss at bedtime. He was also making adjustments to unfamiliar healthy and varied food, as he was accustomed to junk food prior to his removal. The maternal aunt, a resident of Washington state, had applied for placement and was seeking adoption, rather than guardianship. The dispositional hearing was continued to allow for receipt of the guardianship assessment and the Interstate Compact for the Placement of Children (ICPC).

On March 29, 2012, the social worker reported that the maternal aunt was still interested in providing permanency for the minor. The juvenile court held a combined dispositional and six-month review hearing on April 3, 2012. The juvenile court denied reunification services for mother due to her incarceration and set a section 366.26 hearing.[2] The ICPC had not been completed yet but the plan was still to place the minor with the maternal aunt once the ICPC was approved.

On July 9, 2012, the social worker filed an addendum report, explaining that the maternal aunt had been in a rehabilitation program for the last month and had been ruled out for placement due to her alcohol abuse problem. The foster parents with whom the minor had been placed since detention, however, had expressed a strong desire to adopt the minor. The adoptions specialist reported that the minor presented as shy and insecure until he felt comfortable, after which he was talkative and liked to share his interests. He stated that he liked living with his foster parents and would like to stay with them. Although he had a limited understanding of adoption due to his age, he expressed that he was agreeable to adoption by his foster parents, despite missing his mother. He was happy in his placement, bonded to his foster parents, and looked to them to meet his

---

[2] The juvenile court also denied reunification services for the alleged father, who is not a party to this appeal.

3

needs.  He was described as a playful and sensitive boy in desperate need of love, affection, guidance and validation.  He was in good health and on target in his physical development.  The adoptions specialist concluded that the minor yearned for a sense of belonging and needed the stability of a permanent home.[3]

A section 366.26 hearing report was filed on September 27, 2012, recommending a permanent plan of adoption.  The minor had been moved from his previous foster home on July 27, 2012, due to concerns that those foster parents (the same foster parents with whom the minor had been placed since detention) were using corporal punishment and were not providing proper supervision.  The minor's new foster parents, however, had fallen in love with the minor and wanted to adopt him.  The minor had experienced a lot of instability for a five year old, having had six different primary caretakers in the past two years.  The minor was clingy with his new foster mother but appeared to feel safe with her.  The social worker was concerned that any further moves could be potentially devastating to the minor.

An addendum report from the adoptions specialist was filed on October 9, 2012.  The adoptions specialist reported that she had recently visited the minor and, although initially guarded and shy, the minor shared his workbooks from kindergarten and beamed when praised for his good work.  He was observed as readily taking in praise and encouragement from his foster parents and enjoying the special attention he received for being the youngest child in the home.  He appeared playful and happy in his current

---

[3] The record contains a May 2012 behavior modification plan directed at addressing the minor's increased destructive behaviors, caused by anxiety, such as pushing, grabbing toys from others, and breaking things.  His anxiety also made it difficult for him to follow instructions, as evidenced by tantrums of crying and whining (apparently approximately eight times per week).  The plan set forth specific ways these problems would be addressed and modified.  There is no reference to concerns about behavioral problems in the adoptions specialist's report.

placement. He had emerging emotional ties to the foster parents and appeared to find a sense of safety and security with them. The adoptions specialist determined the minor was adoptable and continued to recommend adoption as in his best interests. The adoptions specialist also noted that the emerging relationship with his current foster parents appeared to benefit the minor and meet his needs, and that removal would be detrimental to the minor's well-being.

Another status report was filed on February 13, 2013. The minor was still reported to be happy in his placement and described as "an adorable child that is very likeable." Unfortunately, the minor's foster parents had had to relocate due to mold in the home and were temporarily residing in a home that was too small for them and required they share mealtime with another family. As a result, the minor was experiencing some stress. He was having some outbursts and instances of aggression. He was observed to be pleasant and well-mannered on most occasions but would sometimes act out by yelling at foster family members with no provocation. The outbursts appeared to be motivated by the minor's desire to be the center of attention. He had also been having some outbursts at his previous school (before the move), which had been impeding his ability to learn. An Ages and Screening Assessment had been completed and the minor had scored within the age-appropriate range for all areas except problem solving. The minor was soon to begin school-based counseling to address the stated concerns.

Mother's prison release date had changed several times and then was set for May 13, 2013. On February 21, 2013, she filed a petition for modification requesting the juvenile court grant her reunification services. As changed circumstances, she alleged she had completed an eight-month substance abuse program called the Walden House and, thereafter, remained involved in daily support programs. She also alleged the minor's placement had become unstable. She alleged reunification services would

5

benefit the minor because she had provided a stable home prior to her incarceration and the minor's multiple placement changes were resulting in emotional outbursts.

The hearing on mother's petition for modification and the contested section 366.26 hearing took place on February 27, 2013. Mother testified that she was due to be released from prison on April 1, 2013, and was planning on entering a voluntary residential program in Fresno for 15 months. The program permits women and their children to live there. Her purpose in participating in the program is to obtain the tools and knowledge necessary to live a successful life without incarceration, drugs or alcohol. She had completed a five-month Walden House program, which included services and tools for parenting, anger management, and relapse prevention.[4] She had also been participating in NA and AA programs. She was confident she could live outside of incarceration without resorting back to methamphetamine use once she had "more tools and more sobriety time under [her] belt."

The social worker testified that she had been meeting with the minor once every week or two since his foster family's abrupt temporary relocation. The minor always appeared happy and it appeared that his needs were being met. The minor's foster family had recently moved back into their now remodeled home where the minor had his own room. They were in the process of getting the family licensed or certified through a foster family agency, rather than just the county. The social worker also confirmed that mother keeps in contact, inquires about the minor on a regular basis, and sends him cards and letters.

The juvenile court denied mother's petition for modification requesting reunification services. It found there had been no change in circumstances and that

---

[4] Although the petition for modification alleged the Walden House to be an eight-month program, the certificates of completion, dated October 11, 2012, comport with mother's testimony that the program was five months.

6

setting aside the bypass order would not be in the minor's best interests.  In making its ruling, the juvenile court expressly found that the current placement was stable in the areas important to the minor.  The juvenile court then found the minor was likely to be adopted and that the beneficial relationship exception to adoption did not apply, and terminated parental rights.

## DISCUSSION

### I.  Petition for Modification

Mother contends the juvenile court abused its discretion when it denied her petition for modification seeking reunification services.  We find no abuse of discretion.

Section 388, subdivision (a)(1) provides, in part, "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

At a section 388 hearing, the moving party has the burden of proof to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a requested modification of the previous order in the best interest of the minor.  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child.  [Citation.]  A court hearing a motion for [modification] at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child."  (*Stephanie M.,* at p. 317; see *In re Marilyn H*. (1993) 5 Cal.4th 295, 309; *In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418.)

7

"This determination [is] committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.] As one court has stated, when a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

One of the functions of section 388 is to provide "an 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528; see *In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) However, a petition that "alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Childhood cannot wait while a parent rehabilitates herself. (*In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038.) Rather, the minor's rights to permanence and stability are paramount. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) Furthermore, when the petition is brought at the section 366.26 hearing, the child's interest in stability may outweigh any interest in reunification. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re Edward H.* (1996) 43 Cal.App.4th 584, 594.)

Here, although mother had completed the five-month Walden House program during her incarceration, she had yet to establish she could live methamphetamine-free outside of incarceration.[5] Instead, she presented evidence that she was *going to be*

---

[5] We note that, while mother had finally acknowledged and taken responsibility for her "poor choices" to drive while under the influence, resulting in the death of two people,

8

released from prison in approximately a month and *intended* to enter into a residential treatment program, which she *hoped* would provide her with the additional tools and knowledge necessary to live a successful life without incarceration, drugs or alcohol. This provided evidence of potentially changing circumstances, not changed circumstances. Such tenuous changing circumstances do not meet the requirements of section 388, nor do they warrant delaying permanence and stability for the minor.

Additionally, the evidence supports the juvenile court's finding that the minor's placement was stable. The minor had been in his current placement since July 2012. His needs were being met, he was happy, and he had developed emotional ties to his foster parents. Although the family had needed to temporarily relocate to a small home that was less than ideal, the minor's needs continued to be met during that time. And, in any event, the family was back in their now remodeled home.

Mother did not allege sufficiently changed circumstances to justify a modification of the juvenile court's orders. The juvenile court did not abuse its discretion in denying mother's petition for modification.

## II. Adoptability

Mother next contends the juvenile court's finding that the minor is adoptable is not supported by substantial evidence. We disagree.

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . The permanent plan preferred by the Legislature is adoption.' " (*In re*

there was no evidence she had acknowledged or taken responsibility for her subsequent poor choices in choosing to leave her young child with her mother and not monitoring this placement decision. Indeed, she claimed she was "surprised" to find out her mother was not taking care of the minor. There is no evidence that mother had addressed this parenting issue.

9

*Ronell A*. (1996) 44 Cal.App.4th 1352, 1368, italics omitted.) "In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164; § 366.26, subd. (c)(1).)

Generally, "[t]he issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649.) "[T]he fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*Sarah M.,* at pp. 1649-1650.) However, "questions about the 'suitability' of a prospective adoptive family are 'irrelevant to the issue whether [a minor is] likely to be adopted.' [Citation.] Such questions are 'reserved for the subsequent adoption proceeding,' not the section 366.26 hearing whether to terminate parental rights." (*In re T.S.* (2003) 113 Cal.App.4th 1323, 1329.)

We review a finding of adoptability for substantial evidence. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

The minor here is young and developmentally on track. He has no health concerns or other "special needs" that might make him difficult to place. (Cf. *In re Michael G.*

(1983) 147 Cal.App.3d 56, 58-59.) The evidence also suggested he was capable of developing close attachments to new adults in his life, as he readily bonded with both of his foster mothers.

Mother overstates the minor's behavioral problems. First, it appears some of the minor's behavioral problems may have been related to the instability created by the foster family's temporary housing relocation. Second, the minor's behavioral problems were not so severe as to present a significant hurdle to adoption. (See *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224-225 [prospect that minor may have some continuing behavioral problems did not foreclose finding of adoptability].) The minor is described as adorable, likeable, and generally well-mannered. His outbursts and instances of aggression were not described as severe in nature or of such great concern that it caused caregivers distress. Indeed, the evidence established that *all three* potential caregivers during the period of dependency expressed the desire to adopt the minor, including his current foster parents. This fact, itself, is substantial evidence that any matters relating to the minor are not likely to dissuade individuals from adopting him and that he is likely to be adopted within a reasonable time. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1650.)

In sum, there was clear and convincing evidence that the minor would be adopted within a reasonable time. His relatively minor behavioral problems are far from "so severe as to make the court's finding of adoptability unsupported." (*In re Lukas B.*, *supra*, 79 Cal.App.4th at p. 1154.)

### III. Beneficial Parental Relationship Exception

Mother also contends that the beneficial parental relationship exception to adoption should have been applied in this case. We find no error.

As we noted earlier, " '[a]t the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent

11

plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.*, *supra*, 44 Cal.App.4th at p. 1368.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53, quoting *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

Under certain limited circumstances, the court may find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One of these is the beneficial parental relationship exception, under which the parent has the burden of showing that he or she has maintained regular visitation and contact with the child, and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); *In re C.F.* (2011) 193 Cal.App.4th 549, 553.) It is not enough simply to show "some benefit to the child from a continued relationship with the parent, or some detriment from termination of parental rights." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1349.) Even if there is a significant, positive emotional attachment between parent and child, it does not bar adoption if the child looks to a prospective adoptive parent to meet his or her needs. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 231; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 811.) The benefit to the child must promote the child's "well-being . . . to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural

12

parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.)

When the juvenile court rejects an exception to adoption, we review the court's finding deferentially. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [whether standard of review deemed substantial evidence or abuse of discretion, broad deference to lower court required]; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 [abuse of discretion]; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576 [substantial evidence].)

After mother was arrested, the minor was moved between several adult caretakers, during which time he was subject to physical abuse. The evidence established the minor was in need of stability. He was described by the adoptions specialist as an insecure boy who yearned for a sense of belonging. His anxiety caused some behavioral problems and an unfortunate period of unstable housing contributed to those problems. On one occasion, shortly after his placement with his current foster parents, he was anxious and hid (behind his foster mother) from the social worker until he was assured she was not going to take him anywhere. The evidence also suggests the minor was actually *seeking* stability. He was agreeable to adoption by his first foster parents and said he wanted to stay with them. After placement with his second foster parents in July 2012, he began bonding with them. By November 2012, he had started referring to them as "mom" and "dad" and reported that he would like to live with them forever.

By the time of the section 366.26 hearing, the minor's bond with mother had waned. Due to her incarceration, mother had only 12 visits with the minor over the last 26 months. Mother was loving and appropriate during visits at the jail in September 2011, but they were described merely as "enjoyable for both." After jail visits in April 2012, the foster mother reported the minor had begun to act out. He seemed to believe he would be going home with mother soon. The minor visited mother at the jail in December 2012 and the visit was reported to be "enjoyed" by both. The minor also had a

13

supervised visit at the jail in January 2013.  By that time, he had not requested a visit with mother in several months, but he did agree to the visit when asked.  Although the visit did not appear to upset the minor, it also did not appear to benefit him in any measurable way.

This young minor had endured multiple placements causing significant instability, rendering the need for stability and permanence of great importance.  While the minor appeared to enjoy visits with mother, there was no evidence of a substantial, positive emotional attachment to mother that would cause the minor great harm if severed or would promote his well-being to such a degree as to outweigh the stability he would gain in a permanent home with adoptive parents.

## IV.  ICWA

Finally, mother contends that the ICWA notice requirements were not fully met, alleging the Butte County Department of Employment and Social Services (the Department) failed to make an adequate inquiry or provide all the available information to the tribes.  We find no reversible error.

The purpose of the ICWA notice provisions is to enable the tribe or the Bureau of Indian Affairs (BIA) to investigate and determine whether the children are Indian children.  (*In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421.)  To that end, once the juvenile court has received information that gives reason to believe a child is an Indian child, notice under ICWA must be given.  (*In re Robert A.* (2007) 147 Cal.App.4th 982, 989.)  Notice requirements are construed strictly.  (*Ibid*.)

Notice must include all of the following information, if known:  the child's name, birthplace, and birth date; the name of the tribe in which the child is enrolled or may be eligible for enrollment; names and addresses of the child's parents, grandparents, great-

14

grandparents, and other identifying information, and a copy of the dependency petition. (§ 224.2, subd. (a)(5)(A)-(D); *In re Mary G.* (2007) 151 Cal.App.4th 184, 209.)

Because ICWA is mainly intended to protect and preserve the interests of the tribes, a parent's failure to raise a claim of ICWA notice violation in the juvenile court does not forfeit the issue on appeal. (*In re J.T.* (2007) 154 Cal.App.4th 986, 991; *Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 783, fn. 1; *In re Marinna J.* (2001) 90 Cal.App.4th 731, 738-739.)

Where tribes have received ICWA notice, any error as to that notice is subject to harmless error review. (*Nicole K. v. Superior Court*, *supra*, 146 Cal.App.4th at p. 784.)

At the time of the minor's detention, the maternal grandmother stated that she believed there was Cherokee ancestry on her mother's side of the family. The Department interviewed the maternal grandmother by telephone and sent an ICWA-030 notice form to the Cherokee tribes that contained the following information: mother's names (legal and aliases), date of birth, and tribal affiliations; the maternal grandmother's name, date of birth, place of birth, and tribal affiliations; the maternal great-grandmother's name, date of birth, place of birth, and tribal affiliations; the maternal great-grandfather's name, year of death, and tribal affiliations; the maternal great-great-grandmother's name, place of birth, and tribal affiliations; and the maternal great-great-grandfather's name, possible place of death, and tribal affiliations. The tribes each responded that the minor was not eligible for membership.

Mother asserts that the notice provided to the tribes was deficient because it did not include her place of birth, or addresses for her, the maternal grandmother, or the maternal great-grandmother. With respect to the omitted addresses, we note that mother's address was a prison address and was included on the section 300 petition, as well as the proofs of service, both of which were submitted to the tribes. The record reflects that the maternal grandmother, who was the individual the Department

15

interviewed to obtain family history information, was homeless—which would explain the omission of her address from the notice. Based on the otherwise extensive information obtained from the maternal grandmother about the family members, it is reasonable to assume that she did not know the maternal great-grandmother's address.

Thus, the only information available to the Department but not included in the notice was mother's place of birth. It is reasonable to assume that the maternal grandmother would have been able to provide this information had she been asked. We conclude, however, that the omission of that information was harmless—particularly since none of the noticed tribes requested it after receiving the ICWA notices.

"Notice under the ICWA must . . . contain enough information to constitute meaningful notice." (*In re Karla C.* (2003) 113 Cal.App.4th 166, 175.) On this record, the information provided was enough "to permit the tribe to conduct a meaningful review of its records to determine the child's eligibility for membership." (*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576.) Any error in failing to provide mother's place of birth was harmless.

Mother also argues that the Department "just reported the information at its fingertips without making any extra effort." She argues that additional information, such as the maternal great-grandmother's address, may have been available, had the Department contacted the maternal great-grandmother. However, there is no indication in the record that such contact was possible, as there is no indication the maternal great-grandmother's whereabouts were known. In fact, there is no indication in the record that she is even still alive. We therefore reject mother's argument that the Department failed to make an adequate inquiry into the minor's possible Indian heritage.

## DISPOSITION

The orders of the juvenile court are affirmed.


                                                                        BUTZ          , J.


We concur:


RAYE         , P. J.


ROBIE        , J.