Filed 10/6/16  In re J.G. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. M.E., Defendant and Appellant. | A147881 (San Mateo County Super. Ct. No. 83537) |

M.E. (Mother) appeals from the order of the juvenile court terminating her parental rights to her minor son J.G. pursuant to Welfare and Institutions Code[1] section 366.26.  She contends the court erred when it found that J.G. was likely to be adopted within a reasonable time if parental rights were terminated.  We affirm the findings and orders.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### *"Petition and Detention*

"On March 17, 2014, the Agency filed an amended section 300 dependency petition on behalf of J.G. (then age 6) and his three older half siblings.  The petition

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] We take most of the background section in this opinion from our prior opinion denying Mother's writ petition (*M.E. v. Superior Court* (Jan. 6, 2016, A146527) [nonpub. opn.]), as indicated by quotation marks.  Deletions are indicated with ellipses.

alleged mother failed to adequately supervise and protect them (§ 300, subd. (b)) due to her chronic housing instability, involvement in violent relationships, difficulty managing the children's behavior, serious health issues requiring hospitalizations, and recurring allegations of physical abuse and neglect. Mother had an extensive history of involvement with the Agency dating back to 2001, had received voluntary services, including parenting classes and counseling, since September 2013, and had failed to make substantial progress. J.G. and his siblings were detained. Mother acknowledged she was no longer able to provide for her children's basic needs. At her request, J.G. and two of his siblings were placed with a maternal aunt in Bakersfield. M.L., two years older than J.G., had already been placed in shelter care at mother's request due to his behavioral issues." (*M.E. v. Superior Court*, *supra*, at p. *2, fns. omitted.)

***"Jurisdiction and Disposition***

"On March 18, 2014, mother submitted to the amended petition. The court sustained the allegations of the amended petition, adjudged the minors dependents of the court, continued their out-of-home placement and ordered reunification services to mother. Mother's case plan included parenting classes, counseling/psychiatric therapy, and drug and alcohol testing. Additional objectives included development of positive support systems, demonstration of her ability to supervise and correct her children, meet their physical, emotional, medical and educational needs, and maintain a legal source of income. A six-month review hearing was scheduled for September 11, 2014, with an interim review on June 26, 2014." (*M.E. v. Superior Court*, *supra*, at pp. *2–*3.)

***"The Six-Month Review***

"The interim report prepared for the June review noted mother had relocated to San Diego for two months from the end of March to the end of May 2014. She had attained citizenship and was looking for work. Mother was homeless and needed housing assistance. Mother's schedule did not permit her to visit the children in June.

2

"The status report for the six-month review hearing noted mother had no consistent address during May, June, or July 2014. Since August 1 she had been residing in an emergency shelter. She could not keep a scheduled visit with her children at the end of August 2014 because she had job interviews lined up. She was provided with bus passes every month for travel to Bakersfield, but between April and August 2014 she visited her children once, on July 11. Maternal aunt requested that a new home be found for J.G. closer to his mother, because of conflicts with his siblings. M.L. remained in a therapeutic foster home. Mother stated she needed help with housing, employment and clothing for job interviews. In July, the Agency made a referral to a community worker to assist mother in locating resources. She had begun weekly counseling in July 2014. She remained homeless.

"Due to mother's continued lack of housing and employment, the Agency recommended that the children remain dependents placed in out-of-home care, but that mother receive six more months of family reunification services. At the six-month review hearing held on September 23, 2014, the court found that returning J.G. to mother would create a substantial risk of detriment, the Agency had provided reasonable services, and mother had made minimal progress toward alleviating the causes of the dependency. The court extended services for another six months. The 12-month review hearing was scheduled for February 26, 2015. A return home date of March 10, 2015 was envisioned." (*M.E. v. Superior Court*, *supra*, at pp. *3–*4.)

**"The 12-Month Review**

"The 12-month status review report noted that J.G. struggled with schoolwork in first grade and was being evaluated for Attention Deficit Hyperactivity Disorder (ADHD). Mother had spoken with J.G.'s therapist. She continued to attend parenting classes. She had not missed a session with her therapist and had completed classes in stress management, financial education, communication and conflict resolution, art therapy and a 12-step recovery program offered at her shelter.

3

"Visitation with J.G. had increased since his move to a foster home in San Jose on September 21, 2014. Mother visited J.G. six times between November 9, 2014 and February 9, 2015, including a family visit on December 23, 2014, and three times between March 16 and April 20, 2015. She missed a visit on October 30, 2014. Although the visits went well, mother told the social worker she believed J.G. would be better off remaining in foster care for the time being, because transitions were challenging for him. Mother was no longer pursuing reunification with her two oldest children and agreed they should remain in Bakersfield. Mother continued to reside at the shelter. She planned to move to Fresno with a boyfriend she had met at the shelter. She believed she could find housing and employment in Fresno while maintaining visitation with her children. The social worker viewed this plan as unrealistic.

"The Agency's report recommended termination of reunification services at the 12-month status review hearing, stating: '[J.], [Y.], and [I.] were removed due to the mother's chronic housing instability, involvement in violent relationships and recurring allegations of physical abuse and neglect of the children. During the last twelve months of services, the mother has been unable to secure either ongoing employment or housing that would be available to her children. While her visits with the children, individual mental health therapy and parent education have been positive and beneficial, she has not created the change in her situation that would create stability for her children if they were returned to her despite her participation in the programs at her shelter related to housing and employment.' Noting that the mother had received a total of 17 months of services when voluntary services were included, the Agency's report concluded: 'Given the mother's long history of employment and housing instability, it appears likely she will need longer than the next six months to reach the level of stability she will need to reunify with [J.G.] as her plans for stability are in chronic influx [*sic*] for a variety of reasons posed by the mother.'

4

"The 12-month review hearing scheduled for February 26, 2015 was continued to April 22, 2015 for a contested hearing. An addendum report stated that J.G. had been diagnosed with ADHD and prescribed medication, but mother opposed medicating J.G. Mother had begun working 20 hours a week as a cashier at IKEA in East Palo Alto and expected to be promoted to full-time in the near future. She was no longer planning to move to Fresno and was continuing to search for housing and employment in the Bay Area. She was still living in the shelter. J.G. was conflicted about whether he wanted to return home with his mother or go back to Bakersfield to live with his great-aunt; he wanted to live with both. The report concluded: '[I]t appears likely [mother] will need longer than the next six months to reach the level of stability she will need to reunify with [J.G.].' However, the report suggested that legal guardianship with the maternal great-aunt 'offers a window for the mother to reunify with [J.G.] when she ameliorates the concerns for removal and the issues described in the petition are mitigated.'

"On April 22, 2015, the court extended family reunification services. The court also ordered that J.G. stay in his current placement until the end of the school year, followed by an extended visit with his family in Bakersfield. The 18-month review hearing was set for August 4, 2015, with an interim review on July 9, 2015." (*M.E. v. Superior Court*, *supra*, at pp. *4–*6, fns. omitted.)

"[¶] . . . [¶]

**"The 18-Month Status Review**

"The 18-month status review report for the August 4 hearing stated J.G. had been staying in Bakersfield at his great-aunt's (Ms. Brown's) house since June 12, 2015. Mother had made one phone call to J.G. during his stay in Bakersfield. She had not visited him there, despite three offers of Greyhound bus vouchers by the social worker. Mother told Ms. Brown her work schedule made it difficult for her to call J. G. more frequently or visit him in Bakersfield. The social worker attempted twice to speak with mother without success.

5

"On July 15, 2015, Ms. Brown told the social worker she had concerns about continuing to care for J.G. due to his physically aggressive behavior towards the family's cats and his jealousy of Ms. Brown's granddaughter.[3]  On July 20, 2015, the social worker visited J.G. and Ms. Brown in Bakersfield.  Ms. Brown informed the social worker she was no longer willing to care for J.G. and requested that he leave her home as soon as the Agency could find him another placement.  For his part, J.G. reported he missed his friends and wanted to return to San Jose; his aunt's granddaughter was mean to him and bullied him; and he did not want to stay in Ms. Brown's house.

"[¶] . . . [¶]

"The Agency recommended that reunification services be terminated based on inadequate visitation and mother's chronic housing instability.  Mother saw housing as the only obstacle to J.G.'s return home, but the social worker had expressed to mother that the Agency's 'concern is not limited to her lack of housing, it is the overall level of stability she would be able to provide [J.G.] with upon his return.  The mother has had 18 months with no children in her care to obtain stable employment and during that time she has obtained only part-time employment.  She has consistently reported to the undersigned that her partner is a significant source of support to her and theirs is a healthy relationship; however, their combined resources as well as support from the Project We Hope Shelter where they met, has led only to further homelessness when they ran out of eligibility for the shelter.  The mother has focused on the Section-8 Housing Voucher the undersigned has submitted for [her] as a solution to her now chronic homelessness; however, this focus fails to address the mother's overall level of stability

---

[3] "J.G. could not get his ADHD medication prescription filled in Bakersfield because he was at Ms. Brown's home on an 'extended visit,' not as a 'placement.'  For the same reason, Ms. Brown could not get foster care payments or supportive services to take care of him.  Also, mother refused to approve J.G.'s participation in a day camp that 'would keep him in physical activity conducive to managing his ADHD symptoms from seven in the morning until 6 in the evening.' "

and her ability to consistently manage the portion of a rent Voucher that would be her responsibility.'

"The social worker concluded that J.G.'s difficulty transitioning into the stable environment of Ms. Brown's home was exacerbated by his ADHD symptoms and 'his ongoing uncertainty as to whether he will remain with his aunt or return to his mother's care. The uncertainty regarding his permanency has been emotionally damaging for [J.G.]. He has continued to voice his concerns, and at times lack of desire to live with his mother, and he deserves the emotional stability of a permanent placement.'

"At the social worker's request, J.G. was removed from his great-aunt's home and placed at his former foster home. Mother appeared at the hearing on August 4, 2015. Mother's counsel complained the social worker had done 'very little' to help mother find housing. According to counsel, mother had completed all of her services and '[h]ousing is the last thing holding up this reunification.' The matter was continued to October 1, 2015, for a contested review hearing.

"[¶] . . . [¶]

"The most significant change in services over the previous four months was that the social worker arranged for mother and J.G.'s foster mother to schedule unsupervised visitation themselves, without the social worker's intervention. Initially, mother had more contact by phone with the foster mother, but recently contact had dropped off significantly. Further, the infrequent phone calls have involved mother's speaking with J.G. more than with the foster mother, and mother's boyfriend speaking with J.G. more than mother speaks with him. Mother had not spoken with J.G.'s therapist since April 2015. Mother's main concern about J.G.'s well-being has been that he not become addicted to his ADHD medication. Mother eventually became agreeable to the request that J.G. be medicated, but the social worker was concerned that she would stop his medications if she had the chance, due to her strongly held beliefs about the dangers posed by the medication. Mother was patient and focused when helping J.G. with his

7

homework on unsupervised visits.  The social worker could not say how much mother had benefited from the parent education she received because the social worker was not present during mother's mostly unsupervised visits.  She was present during supervised visits with M.L. and J.G.  Mother remained calm when M.L.'s behavior escalated; she also relied on support staff for assistance when he had a strong reaction to something.

"The social worker had met with J.G. monthly over the previous four months. J.G. talked about wanting to live with his mother, his foster mother, at his great-aunt's home in Bakersfield, and at the social worker's home, indicating to the social worker that 'there is a great deal of confusion for him around this issue of where he's going to live.' The social worker believed the confusion has caused him 'considerable emotional harm.'

"Initially, J.G. had expressed resistance to living with mother and her boyfriend. The other children clarified that, in the past, mother had spent more of her time and attention on previous boyfriends than with the children, sometimes locking them out of the shelter room to ' "entertain boyfriends." '  Since building a relationship with the current boyfriend, J.G. was more focused on wanting to live with mother because she said M.L. would be there (which was unlikely), and also promised them both dogs and goldfish.

"During the previous four months, mother had one unsupervised visit with J.G. and one supervised joint visit with J.G. and M.L.  During J.G.'s extended visit with his great-aunt in Bakersfield, mother called J.G. infrequently.

"J.G.'s CASA worker expressed the opinion to the social worker on September 25 that J.G.'s needs would be best met by his foster mother or by an adoptive home.  Her opinion was based on her weekly visits with J.G. and her communications with the foster mother.  Minor's attorney joined with the Agency's position that it would not be in the minor's best interest to return him to mother at that time, and that services should be terminated.

"The court found by clear and convincing evidence that reasonable services had been offered and mother had not made substantive progress to the extent that J.G. could be returned to her on that day, particularly in light of the 'virtual lack of contact . . . in the last two or three months.' The court terminated services to mother, adopted the other orders as proposed by the Agency, and set the section 366.26 hearing." (*M.E. v. Superior Court*, *supra*, at pp. *7–*13.)

On review of Mother's petition for extraordinary relief, we found substantial evidence supported the finding that the return of J.G. to Mother would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being. We observed that "[b]y the time of the 18-month review hearing on October 1, 2015, J.G. had been out of parental custody for at least 19 months, since mother acknowledged she could no longer care for his basic needs and voluntarily agreed to his placement with her aunt in Bakersfield in February 2014. The record reflects she had received at least 24 months of services, counting the voluntary family maintenance case plan started in September 2013. Mother's participation in her case plan appears to have peaked around March or April 2015, when she met with J.G.'s therapist, was seeing her own therapist weekly, attended classes in parenting, stress management, financial education, communication, conflict resolution, art therapy, and a 12-step recovery program offered by the shelter, was visiting J.G. regularly (nine times between November 2014 and April 2015), and had landed a part-time job as a cashier with IKEA. However, she remained homeless, living in a shelter. Despite the Agency's recommendation that services be terminated, the court extended services for another six months, no doubt in recognition of the tremendous strides she had made toward reunification.

"However, soon thereafter mother's efforts began to flag. Although she agreed J.G. should spend a long visit with his great-aunt in Bakersfield, and despite the availability of bus passes from the Agency, mother did not visit J.G. at all while he was there and called him only once. She overstayed her time in the shelter and had to leave.

9

She lived in [a] tent for a while with her boyfriend, and was looking into renting a trailer. Once J.G. returned to his foster placement in San Jose, visitation did not increase, despite mother having maximum flexibility to arrange her visits directly with the foster mother. She had two visits with J.G. between July and October 2015. In the social worker's opinion, J.G.'s confusion about where he was going to live had already caused him harm." (*M.E. v. Superior Court*, *supra*, at pp. *13–*14.)

### *The Section 366.26 Hearing Report*

The Agency prepared a court report for the section 366.26 hearing. The report noted that while J.G. was in good physical health, he was also diagnosed with disruptive behavior disorder, not otherwise specified, and ADHD, combined type. And while he was taking medication, his medication prevented him from sleeping through the night. His therapeutic social worker, in consultation with his psychiatrist, was working to change his medication. The foster mother stopped giving him medication in the afternoon and the sleep interruptions stopped. However, at that time neither the social worker nor the foster mother was able to formally adjust his medication as J.G.'s psychiatrist was on vacation.

In early February 2016, J.G.'s special education teacher informed the Agency's social worker that he was "thriving" in school. The teacher reported that since J.G. began taking medication, his academic progress was like "night and day." Likewise, in mid-March 2016 his foster mother told the worker that "overall everything has improved." However, he continued to have episodes of being out of control, especially when he did not take his medication. His symptoms also increased after he had visits with his siblings. At one point, his acting-out behaviors led his school bus driver to threaten to not allow him on the bus.

Previously, during the months of October, November, and December in 2015, J.G.'s behaviors ranged from jumping and running around and hollering to stealing from his caregiver. Sometimes he refused to brush his teeth and he refused to keep his seat

10

belt on. Sometimes while out in public he would befriend strangers and sometimes he would disappear. Other times he was destructive with things in the house, such as tearing up a carpet and a cabinet. J.G. had tantrums so often that his foster mother devised an intervention of a "scheduled" tantrum so that he had as much time as he needed to have a tantrum.

The Agency considered J.G. to be very adoptable, although an adoptive family had not yet been identified. Despite the problematic behaviors described above, J.G. had been in the same placement since July 2015. In March 2016, J.G. started working with a family specialist and he was referred for therapeutic behavioral services. In addition, his individual mental health clinician collaborated with the foster mother, his CASA volunteer, and his family specialist to address his behavioral and emotional needs.

### The Section 366.26 Hearing

The section 366.26 hearing was held on March 29, 2016. Mother testified that she did not believe J.G. was adoptable, based on what she had read in the reports. She felt the best plan for him was long-term foster care or guardianship.

In closing argument, Mother's trial counsel rhetorically asked that if the foster mother could not control this child, how could the juvenile court expect an adoptive parent to control J.G. The court replied: "I don't see that the foster parent is saying she can't control [J.G.]; she's just saying he has issues. And clearly he does. But it's a jump to go from that to the fact that he's uncontrollable. I don't read the report that way at all. The goal here is to get permanence for [J.G.]. Unfortunately it's not the purpose of this hearing to tread water while mom gets herself back on her feet . . . . The purpose of this hearing is to determine permanence for [J.G.] if we can. He seems adoptable to me based on all the information I have."

Thereafter the juvenile court found by clear and convincing evidence that it was likely that J.G. would be adopted, and it terminated Mother's parental rights as well as

11

the alleged father's parental rights. The first adoption review hearing was set for September 29, 2016.[4] This appeal followed.

## DISCUSSION

Mother's sole argument on appeal is that there was insufficient evidence to support the finding that J.G. was adoptable. We are not persuaded.

A finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*Zeth S.*, *supra*, 31 Cal.4th at p. 406; see § 366.26, subd. (c)(1).) The question of adoptability usually focuses on whether the child's age, physical condition, and emotional health make it difficult to find a person willing to adopt that child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) If the court finds the child is likely to be adopted within a reasonable time, the juvenile court is required to terminate parental rights unless the parent shows that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)(A) and (B). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343–1345.)

On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child was likely to be adopted within a reasonable time. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562; *Zeth S., supra,* 31 Cal.4th at p. 406.) The appellate court does not reweigh the evidence, evaluate the credibility of witnesses, or indulge in inferences contrary to the findings of the trial court. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053; *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968; *Howard v. Owens Corning*

---

[4] The Agency has filed a motion for consideration of additional evidence indicating that J.G. was placed with prospective adoptive parents in July 2016, after Mother's parental rights were terminated. The motion is denied. (See *Zeth S.* (2003) 31 Cal.4th 396, 405–406 (*Zeth S.*) [no exceptional circumstances to justify deviating from general rule that appeal reviews the correctness of judgment as of the time of its rendition].)

(1999) 72 Cal.App.4th 621, 631.) The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts. (See *Zeth S.,* at p. 405.)

Attributes indicating adoptability include young age, good physical and emotional health, intellectual growth, and ability to develop interpersonal relationships. (*In re Gregory A.*, *supra*, 126 Cal.App.4th at p. 1562.) In disputing the finding on appeal, Mother puts the most negative possible spin on the evidence presented. True, as Mother now emphasizes, J.G. suffered behavioral issues during his extended foster placement that caused him to be placed on psychotropic medication. He initially struggled in his foster placement, to the point of frequent tantrums and other behavioral issues. But it is also true that his issues improved as he experienced the stability of his foster placement and received therapeutic services. Indeed, much of his behavioral problems were precipitated by contact with his family members, including his great-aunt, Mother, and his siblings. He was otherwise reported to be an active and engaging boy whose behaviors were improving, and who was capable of bonding with his caregivers.[5] While J.G. was eight years old at the time of the section 366.26 hearing, he was physically healthy. Overall, the relevant factors pointed toward adoptability. Appellate counsel essentially asks this court to reweigh the evidence and draw a different conclusion. This, however, is not within our appellate purview. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379.)

_____

[5] Although J.G. has a history of behavioral and psychological problems, when the social worker is aware of the child's medical, developmental, or mental problem, but believes the problem does not impede the child's chances for adoption, the problem does not render the child unadoptable. (See *In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523–525, overruled on other grounds in *Zeth S., supra,* 31 Cal.4th at pp. 413–414.) Here, the social worker stated she believed J.G was adoptable despite his behavior problems, noting his behavior had improved since November 2015 in response to increased medication.

Mother's focus on the fact that there was no adoptive report because there was not an identified, committed adoptive family at the time of the hearing is also misguided.[6] "The issue of adoptability posed in a section 366.26 hearing focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649–1650.) Section 366.26, subdivision (c)(1), expressly states, "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."

The cases Mother relies on are distinguishable. In *Amelia S.* (1991) 229 Cal.App.3d 1060, the minor was one of 10 children, ranging in age from a newborn to nine, who were all taken into protective custody. (*Id.* at p. 1062.) Each permanency hearing dealt with five of the children. (*Ibid.*) The permanency reports indicated that the sibling set to which the minor belonged would all be placed together. (*Id.* at p. 1063.) The report stated that "[r]ecruitment for prospective adoptive families ha[d] been initiated and several possible families ha[d] already been identified," but did not state that any had expressed willingness to adopt. (*Ibid.*) A petition for modification filed by the adoption assessment agency asserted: " 'The minor is a special needs child in that the minor is part of a sibling set of ten. The minor suffers from social delays as well. Due to the above circumstances, [the agency] considers the minor a hard to place child.' " (*Ibid.*) The reviewing court found, under the circumstances, that the fact "a few foster parents

---

[6] To the extent Mother's challenge to the juvenile court's order is based specifically on the absence of a report—as opposed to a more general attack on the sufficiency of the evidence—her objection was forfeited by her failure to object below to the lack of a report. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1317; *In re Brian P.* (2002) 99 Cal.App.4th 616, 623.)

14

were *considering* adoption" was "a far cry . . . from the clear and convincing evidence required to establish the *likelihood* of adoption." (*Id.* at p. 1065.)  In the present case, unlike *Amelia S.,* there is no evidence that anyone has ever identified J.G. as a "special needs child" or a "hard to place child."[7]

In *In re Tamneisha S.* (1997) 58 Cal.App.4th 798, also cited by Mother, the social services agency was unable, after a 10-month search, to find an adoptive home for the child. (*Id.* at pp. 802–803.)  The child was born suffering from cocaine withdrawal (*id.* at p. 800) and had serious medical issues (*id.* at pp. 801–802).  Ultimately, the juvenile court granted a guardianship after finding the agency had failed to show the minor was likely to be adopted. (*Id.* at p. 803.)  The Court of Appeal affirmed the order of guardianship. (*Id.* at p. 808.)  Again, this case is different.  Here, there has been no excessively lengthy search for adoptive parents.  J.G. is a healthy child who has shown the ability to form attachments with caregivers.  These facts suggests his adoptability does not depend on the willingness of any particular foster parent to adopt them.

Finally, we reject Mother's concern that J.G. may become a legal orphan without parents, natural or adoptive.  Section 366.26, subdivision (i)(3), remedies that danger by allowing the order terminating parental rights to be set aside when no adoptive parents can be found after a specified period of time.

In sum, we conclude that the record contains substantial evidence in support of the juvenile court's finding that it is likely J.G. will be adopted.

---

[7] Analogizing the situation of J.G. to that of circumstances involving a "special needs" child, it is true that sometimes special needs children are more difficult to place than those without such needs.  For example, in *In re Michael G.* (1983) 147 Cal.App.3d 56, the minor was developmentally disabled and suffered from serious emotional problems.  According to the record in that case, the seven-year-old minor functioned below his age level, was not completely toilet trained, and possessed limited language abilities.  On that record, the court noted all parties had conceded adoptive placement would be difficult. (*Id.* at pp. 58–59.)  The circumstances here are much less serious.

15

## DISPOSITION

The findings and orders are affirmed.

_____
DONDERO, J.

We concur:


_____
HUMES, P. J.


_____
BANKE, J.

A147881

17